Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Melissa D. Medilien, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES' INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
COMPANY,

Docket No.:_____ (      )

Plaintiffs,

-against-

**Plaintiffs Demand
a Trial by Jury**

EMMONS AVENUE MEDICAL OFFICE, P.C.,
RUBEN OGANESOV, M.D., and
JOHN DOE DEFENDANTS "1" – "10",

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants Ruben Oganesov, M.D., Emmons

Avenue Medical Office, P.C., and John Doe Defendants "1" through "10" (collectively, the

"Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $365,000.00 that Defendants wrongfully obtained from GEICO, and expunge more than $678,000.00 in pending fraudulent billing submitted by Defendants relating to medically unnecessary, experimental, excessive, and otherwise unreimbursable healthcare services in the form of bogus patient evaluations, outcome assessment testing, functional capacity evaluations ("FCE"), and extracorporeal shockwave therapy ("ESWT")  (collectively, the "Fraudulent Services"), which were allegedly provided to New York automobile accident victims insured by GEICO ("Insureds").

2.      Defendant Ruben Oganesov, M.D. ("Oganesov") is a physician who purports to own Emmons Avenue Medical Office, P.C. ("Emmons Avenue"), which was used to submit the billing for the Fraudulent Services.  Emmons Avenue purports to be a legitimate professional corporation, but it operated on a transient basis, maintaining no stand-alone practice, having no patients of its own, and providing no legitimate or medically necessary services. Emmons Avenue billed GEICO and other New York automobile insurers over a million dollars for the medically unnecessary, experimental, and excessive Fraudulent Services purportedly rendered in New York – all while Oganesov primarily resided and practiced in Massachusetts.

3.      Oganesov, along with John Doe Defendants "1"-"10", perpetrated the fraudulent scheme using illegal referral and kickback arrangements to permit Emmons Avenue to access a steady stream of patients, fraudulently bill GEICO, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

4.      GEICO seeks to recover the monies stolen from it and, further, seeks a declaration that it is not legally obligated to pay reimbursement of the pending no-fault insurance claims that have been submitted by or on behalf of Emmons Avenue because:

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(iii)     the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and through the use of illegal kickback arrangements.

5.     The Defendants fall into the following categories:

(i)     Defendant Oganesov is a physician primarily residing and practicing in Massachusetts, who is also licensed to practice medicine in the State of New York, purports to own Emmons Avenue, and who purported to perform some of the Fraudulent Services.

(ii)     Defendant Emmons Avenue is a New York medical professional corporation, through which the Fraudulent Services purportedly were performed and were billed to New York automobile insurance companies, including GEICO.

(iii)     John Doe Defendants "1"-"10" are individuals and/or entities who participated in the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of Emmons Avenue and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for Emmons Avenue, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

6.     As discussed herein, the Defendants at all relevant times have known that (i) the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iii) the Fraudulent Services were

provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons and through the use of illegal kickback arrangements.

7.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed to GEICO.

8.      The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that Defendants submitted, or caused to be submitted, to GEICO.

9.      The Defendants' fraudulent scheme began in December 2020 and has continued uninterrupted through the present day as Emmons Avenue continues to seek collection on pending charges for the Fraudulent Services.

10.     As a result of Defendants' fraudulent scheme, GEICO has incurred damages of more than $365,000.00 and faces more than $678,000.00 in additional pending, fraudulent billing by Emmons Avenue.

## THE PARTIES

### I.      Plaintiffs

13.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

14.     Defendant Oganesov resides in and is a citizen of Massachusetts.

15.     Oganesov was licensed to practice medicine in New York on July 29, 1985 and serves as the nominal owner of Emmons Avenue.

16.     Defendant Emmons Avenue is a New York professional corporation incorporated on or about December 24, 2020, with its principal place of business in Brooklyn, New York, and which purports to be owned and controlled by Oganesov.

17.     Emmons Avenue has been used by Oganesov and John Doe Defendants "1"-"10" to submit fraudulent billing to GEICO and other insurers.

18.     Emmons Avenue mailed virtually all bills for the Fraudulent Services to GEICO from Brooklyn, New York.

19.     Upon information and belief, John Doe Defendants "1"-"10" reside in and are citizens of New York.  John Doe Defendants "1"-"10" are unlicensed, non-professional individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of Emmons Avenue and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for Emmons Avenue, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

21.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

22.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

24.    GEICO underwrites automobile insurance in New York.

### III.    An Overview of the Pertinent Law Governing No-Fault Reimbursement

24.    New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.

25.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" benefits or "PIP Benefits") to Insured.

26.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

27.    An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

28.    Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

29.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

30.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

31.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

32.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

33.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

34.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

35.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals if it permits unlicensed laypersons to control or dictate the treatments or allows unlicensed laypersons to share in the fees for the professional services.

36.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

37.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

38.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

39.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

40.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with

applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

41. Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## IV.   Defendants' Fraudulent Scheme

### A.   Overview of the Scheme

42. Beginning in December 2020 and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which Emmons Avenue was used to bill GEICO and other New York automobile insurers over a million dollars for medically unnecessary, experimental, and otherwise unreimbursable services.

43. The Fraudulent Services billed under the name of Emmons Avenue were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

44. The Defendants billed GEICO and other New York insurers for the Fraudulent Services, which were allegedly rendered in New York to victims of automobile accidents, including GEICO Insureds.

45. Oganesov primarily resided and practiced in Massachusetts at all relevant times when Emmons Avenue was billing for the Fraudulent Services purportedly provided in New York.

46.     Emmons Avenue did not have any legitimate medical office in New York and submitted all of its billing to GEICO using either a PO Box address in Jamaica, New York or the address of a billing company in Brooklyn, New York.

47.     Emmons Avenue also did not have any single, fixed location where it provided, or purported to provide, healthcare services.

48.     Oganesov, instead, operated Emmons Avenue on an itinerant basis from various "No-Fault" medical clinics, primarily located in Brooklyn, Queens, and the Bronx where Emmons Avenue received steady volumes of patients through no efforts of their own, including at the following clinics (collectively, the "Clinics"):

- 60 Belmont Avenue, Brooklyn;
- 146 Empire Boulevard, Brooklyn;
- 1975 Linden Boulevard, Brooklyn;
- 3910 Church Avenue, Brooklyn;
- 1120 Morris Park Avenue, Bronx;
- 4014A Boston Road, Bronx;
- 14 Bruckner Boulevard, Bronx;
- 332 East 149th Street, Bronx;
- 3432 East Tremont Avenue, Bronx;
- 160-59 Rockaway Boulevard, Queens;
- 82-17 Woodhaven Boulevard, Queens;
- 1655 Richmond Avenue, Staten Island; and
- 430 West Merrick Road, Valley Stream.
-

49.     In order to obtain access to the Clinics' patient base (i.e., Insureds), Oganesov and Emmons Avenue entered into illegal financial and kickback arrangements with the unlicensed persons who provided access to the patients that were treated, or who purported to be treated, at the Clinics.

50.     Oganesov and Emmons Avenue thereafter subjected Insureds at the Clinics to various medically unnecessary and illusory healthcare services, including bogus consultations where the supposed "results" were never incorporated into any of the Insureds' treatment plans or otherwise acted upon in any

way, purported diagnostic testing with no clinical basis, and purported ESWT that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

**B.      The Illegal Kickback and Referral Relationships at the Clinics**

50.      Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality were organized to supply "one-stop" shops for no-fault insurance fraud.

51.      Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and dictated fraudulent protocols used to maximize profits without regard to actual patient care.

52.      Oganesov did not have his own patients at the Clinics and did nothing to create a patient base.

53.      Oganesov did not advertise for patients, never sought to build name recognition, or make any legitimate efforts of his own to attract patients on behalf of Emmons Avenue at the Clinics.

54.      Oganesov did virtually nothing that would be expected of the owner of a legitimate medical professional corporation to develop its reputation and attract patients to the Clinics.

55.      As Oganesov did not have any patients of his own, the healthcare services that he could provide to the patients at the Clinics was limited and controlled by the owners of the Clinics, who were interested only in maximizing profits without regard to genuine patient care.

56.      The Clinics provided facilities for Emmons Avenue, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

57.      In fact, GEICO received billing from many of the Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a

"practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

58.     For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 60 Belmont Avenue, Brooklyn, New York from a "revolving door" of more than 70 different purported healthcare providers.

59.     Additionally, GEICO has received billing for purported healthcare services rendered at the Clinics located at 146 Empire Boulevard, Brooklyn, New York and 4014A Boston Road, Bronx, New York from a "revolving door" of more than 75 purported medical providers.

60.     Additionally, GEICO has received billing for purported healthcare services rendered at the Clinic located at 1975 Linden Boulevard, Brooklyn, New York from a "revolving door" of more than 100 different purported healthcare providers.

61.     Further, GEICO has received billing for purported healthcare services rendered at the clinic at 3910 Church Avenue, Brooklyn, New Yok from a "revolving door" of more than 75 different purported healthcare providers.

62.     Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and directed fraudulent protocols used to maximize profits without regard to actual patient care.

63.     For example, a physician who worked at the 3910 Church Avenue, Brooklyn location stated under oath that he ended his involvement with the Clinic at that location because of, among other things: (i) his concern about the manner in which patients were brought to the Clinic; (ii) the manner in which the Clinic was operated; (iii) the use of his signature stamp without his consent; and (iv) the submission of billing for services through his personal tax identification number without his consent.

64.     Many of the medical providers at the 3910 Church Avenue, Brooklyn location were also named as defendants in a federal RICO action where GEICO credibly alleged that the location was owned and controlled by laypersons and the medical providers performed medically unnecessary services based on the improper financial (and other) relationships among the defendants and laypersons.  See Government Employees Insurance Co., et al., v. East Flatbush Medical, P.C., et al., 20-CV-1695 (MKB)(PK).

65.     Oganesov, in order to obtain access to the Clinics' patient base (i.e. Insureds), entered into illegal financial arrangements with unlicensed persons, including John Doe Defendants "1"-"10", who "brokered" or "controlled" patients that were treated, or who purported to be treated, at the Clinics.

66.     The financial arrangements that Oganesov and Emmons Avenue entered into included the payment of fees ostensibly to "rent" space from the Clinics.

67.     However, the financial arrangements that Oganesov and Emmons Avenue entered into were actually "pay-to-play" arrangements that caused unlicensed laypersons to steer Insureds to Emmons Avenue for medically unnecessary services at the Clinics.

68.     For example, at least one check issued from Emmons Avenue's corporate account was illegally exchanged for cash by non-party Alla Kuratova ("Kuratova") at a check cashing facility, using phony application paperwork.

69.     In 2013, Kuratova was indicted for her involvement in a prescription drug trafficking ring, which included the recruitment of individuals to act as phony patients in visits with corrupt medical

70.     In further keeping with the fact that the payments made by Emmons Avenue were actually disguised kickbacks in exchange for patient referrals, Emmons Avenue provided no legitimate or necessary services that warranted other providers at the Clinics to bring in Emmons Avenue to the Clinics to treat the patients.

71.     Oganesov and Emmons Avenue made the various kickback payments in exchange for having Insureds referred to Emmons Avenue for the medically unnecessary Fraudulent Services at the Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

72.     The amount of kickbacks paid by the Defendants generally was based on the volume of Insureds that were steered to Emmons Avenue for the purported medically unnecessary services.

73.     Oganesov had no genuine doctor-patient relationship with the Insureds that visited the Clinics, as the patients had no scheduled appointments with Emmons Avenue.

74.      Having no scheduled appointments, the Insureds were simply directed by the Clinics, and the unlicensed persons associated therewith, to subject themselves to treatment by whatever healthcare provider was working for Emmons Avenue that day, because of the kickbacks paid by Oganesov and Emmons Avenue.

75.     The unlawful kickback and payment arrangements were essential to the success of the Defendants' fraudulent scheme.   The Defendants derived significant financial benefit from the relationships because without access to the Insureds, the Defendants would not have the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

76.     The Defendants at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

**C.     The Defendants' Fraudulent Treatment and Billing Protocol**

82.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

83.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and

thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

84.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. Rather, the Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from the fraudulent billing submitted to GEICO and other insurers.

### 1.     The Fraudulent Charges for Initial Consultations

85.     Upon receiving a referral pursuant to the kickbacks that Oganesov and Emmons Avenue paid to the unlicensed laypersons associated with the Clinics, the Defendants purported to provide Insureds in the claims identified in Exhibit "1" with an initial consultation.

86.     In keeping with the fact that the initial consultations were performed pursuant to the kickbacks that Oganesov and Emmons Avenue paid at the Clinics, Emmons Avenue virtually always purported to perform the initial consultations at the Clinics where they obtained their initial referrals, rather than at any stand-alone practice.

87.     The initial consultations were performed as a "gateway" in order to provide Insureds with an excessive number of phony, pre-determined "diagnoses" that served as purported justification for the exploitation of the Insureds through other medically unnecessary and illusory services.

88.     Typically, either Oganesov or someone associated with Oganesov and Emmons Avenue purported to perform the initial consultations, which were then billed to GEICO through Emmons Avenue.

89.     Emmons Avenue typically billed the initial consultations under CPT code 99244, typically resulting in a charge of $324.69.

90.     The charges for the initial consultations were fraudulent in that the consultations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the

kickbacks that the Defendants paid at the Clinics in coordination with John Doe Defendants "1"- "10", not to treat or otherwise benefit the Insureds.

91.     Furthermore, the charges for the initial consultations were fraudulent in that they misrepresented the nature and extent of the initial consultations.

92.     For example, in every claim identified in Exhibit "1" for initial consultations under CPT codes 99244, the Defendants misrepresented and exaggerated the amount of face-to-face time that the examining healthcare professional spent with the Insureds or the Insureds' families.

93.     The use of CPT code 99244 typically requires that a healthcare professional spend 60 minutes of face-to-face time with the Insured or the Insured's family.

94.     Though the Defendants billed for most of their initial consultations under CPT codes 99244, no healthcare professional associated with the Defendants spent 30 minutes, let alone 60 minutes, on an initial consultation.

95.     Rather, the initial consultations in the claims identified in Exhibit "1" rarely lasted more than 10-15 minutes.

96.     In keeping with the fact that the initial consultations rarely lasted more than 10-15 minutes, Oganesov and Emmons Avenue used checklist forms in purporting to conduct the initial consultations.

97.     The checklist forms that Oganesov and Emmons Avenue used in conducting the initial consultations set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

98.     All that was required to complete the checklist forms was a brief patient interview and a perfunctory physical examination of the Insureds.

99.     These interview and examinations did not require the Defendants to spend more than 10-15 minutes of face-to-face time with the Insureds during the putative initial examinations.

100.     In addition, pursuant to the Fee Schedule, when the Defendants submitted charges for initial consultation under CPT codes 99244 or caused them to be submitted, they falsely represented that a healthcare professional associated with Emmons Avenue: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity."

a.     <u>Misrepresentations Regarding the Performance of Consultations</u>

101.     Pursuant to the Fee Schedule, the use of CPT code 99244 to bill for an initial patient encounter represents that the examining physician performed a "consultation" at the request of another physician or other appropriate source.

102.     However, the Defendants did not provide their purported "consultations" – to the extent that they are provided at all – at the request of any other physicians or other appropriate sources. Rather, to the extent that the putative "consultations" were performed in the first instance, they were performed solely as part of Defendants' fraudulent treatment protocol, in order to generate billing for Emmons Avenue.

103.     In keeping with the fact that Defendants did not provide their purported "consultations" at the request of another physician or appropriate source, the supposed "results" of the putative "consultations" were neither transmitted back to any referring physicians or other appropriate sources, nor were the supposed "results" of the putative "consultations" incorporated into any of the Insureds' treatment plans, or otherwise acted upon in any way.

104.     Pursuant to the Fee Schedule, the use of CPT code 99244 to bill for a patient consultation represents that the physician who performed the consultation submitted a written consultation report to the physicians or other appropriate sources who purportedly requested the consultations in the first instance.

105.    However – and, again, in keeping with the fact that Defendants did not provide their purported "consultations" at the request of another physician or appropriate source – Defendants did not submit any written consultation report to any referring physician or other healthcare provider.

106.    In the claims for purported "consultations" identified in Exhibit "1", the Defendants misrepresented the underlying services to be consultations billable under CPT code 99244 because such consultations are reimbursable at a higher rate than commensurate patient examinations.

### b.    Misrepresentations Regarding "Comprehensive" Patient Histories

107.    Pursuant to the Fee Schedule, when the Defendants submitted charges for initial consultations under CPT codes 99244, they represented that they took a "comprehensive" patient history.

108.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

109.    Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

110.    The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)     constitutional symptoms (e.g., fever, weight loss);

(ii)    eyes;

(iii)   ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)     respiratory;

(vi)    gastrointestinal;

(vii)   genitourinary;

(viii)    musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)    neurological;

(xi)    psychiatric;

(xii)    endocrine;

(xiii)    hematologic/lymphatic; and

(xiv)    allergic/immunologic.

111.    When the Defendants billed for the initial consultations under CPT codes 99244, they falsely represented that they took a "comprehensive" patient history from the Insureds they purported to treat during the initial consultations.

112.    In fact, Defendants did not take a "comprehensive" patient history from the Insureds they purported to treat during the initial consultations, because they did not document a review of the systems directly related to the history of the patients' present illnesses or a review of 10 organ systems unrelated to the history of the patients' present illnesses.

113.    Rather, after purporting to provide the initial consultations, the Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

114.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of: (i) purported diagnoses that did not correlate with the patient's actual symptoms or concerns; and (ii) Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers.

        c.    <u>Misrepresentations    Regarding    "Comprehensive"    Physical Examinations</u>

115.     Moreover, pursuant to the Fee Schedule, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

116.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

117.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

20

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

118.   When the Defendants billed for the initial consultations under CPT code 99244, they falsely represented that they performed a "comprehensive" patient examination on the Insureds they purported to treat during the initial consultations.

119.   In fact, Defendants did not conduct a general examination of multiple patient organ systems or conduct a complete examination of a single patient organ system.

120.   For instance, the Defendants did not conduct any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

121.   Furthermore, although the Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during their putative initial examinations, the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)   at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)   the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)   examination of gait and station;

(vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper

extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and/or

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

d.   <u>Misrepresentations Regarding the Extent of Medical Decision-Making</u>

122.   Similarly, when Emmons Avenue submitted charges for initial consultations under CPT code 99244, they represented that they engaged in medical decision-making of "moderate complexity."

123.   Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

124.   Though the Defendants routinely falsely represented that their initial examinations and consultations involved medical decision-making of "moderate complexity" in actuality the initial examinations and consultations did not involve any medical decision-making at all, and, in the unlikely event that an Insured did present with such injuries or symptoms, the deficient initial examinations and consultations were incapable of assessing and/or diagnosing them as such.

125.   First, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

126.   Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Emmons Avenue, to the extent that

Emmons Avenue provided any such diagnostic procedures or treatment options in the first instance. In almost every instance, any diagnostic procedures and "treatments" that Emmons Avenue actually provided were limited to a series of medically unnecessary diagnostic tests, none of which were health or life-threatening if properly administered.

127.    Second, Emmons Avenue did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

128.    In fact, no physician associated with Emmons Avenue engaged in any medical decision-making at all. Rather, the outcome of the initial examinations and consultations were pre-determined for virtually every Insured to result in phony boilerplate "diagnoses" of sprains and strains.

129.    The initial examinations and consultations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that Defendants purported to perform and then billed to GEICO and other insurers.

**2.      The Fraudulent "Outcome Assessment Testing"**

130.    In addition to the initial consultations, the Defendants also subjected Insureds to medically unnecessary "outcome assessment tests" on or about the same dates they purported to subject the Insureds to initial consultations.

131.    The Defendants billed the "outcome assessment tests" to GEICO using CPT code 99358, generally resulting in a charge of $280.12 for each round of "testing."

132.    Like the Defendants' charges for the other Fraudulent Services, the charges for the "outcome assessment tests" were fraudulent in that the tests were medically unnecessary and were performed, to the extent they were performed at all, pursuant to the illegal kickback and referral schemes and fraudulent treatment protocol.

133.    Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial consultation, and since the "outcome assessment tests" that the Defendants

purportedly provided were nothing more than a questionnaire regarding the Insureds' history and physical condition, the Fee Schedule provides that the "outcome assessment tests" should have been reimbursed as an element of the initial consultation.

134.    In other words, healthcare providers cannot conduct and bill for an initial consultation and then bill separately for contemporaneously provided "outcome assessment testing."

135.    In the event the Defendants did perform the "outcome assessment tests" for which GEICO was billed, the information gained through the use of the tests would not have been significantly different from the information that the Defendants purported to obtain during virtually every Insured's initial and follow-up patient history and examinations. In fact, the Defendants, in billing for fraudulent initial consultations, represented they took at least a "comprehensive" patient history and performed a "comprehensive" physical examination.

136.    The "outcome assessment tests" represented purposeful and unnecessary duplication of the patient histories and examinations purportedly conducted during the Insureds' initial examinations and follow-up examinations. The "outcome assessment tests" were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered – to the extent rendered at all – pursuant to a predetermined protocol that was designed solely to financially enrich the Defendants and in no way aided in the assessment and treatment of the Insureds.

137.    The Defendants' use of CPT code 99358 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that the physician actually spent at least one hour performing some prolonged service, such as a review of extensive records and tests, or communication with the Insured and the Insured's family.

138.    Though the Defendants routinely submitted billing under CPT code 99358 for "outcome assessment tests", no physician associated with the Defendants spent an hour reviewing or administering the tests, or communicating with the Insureds or their families.

139.    Indeed, the "outcome assessment tests" did not require any physician involvement at all, inasmuch as the "tests" simply were questionnaires that were completed by the Insureds.

140.    Nevertheless, the Defendants submitted billing to GEICO for billing under CPT code 99358.

141.    As the outcome assessment tests were medically unnecessary and were performed pursuant to the Defendants' pre-determined fraudulent treatment protocol and illegal kickback scheme, the results of the outcome assessment tests like the other Fraudulent Services, were not incorporated into the Insureds' respective treatment plans.

### 3.    The Fraudulent Functional Capacity Evaluation Tests

144.    In addition to other Fraudulent Services, the Defendants purported to provide FCE tests to Insureds.

145.    Like the Defendants' charges for the other Fraudulent Services, the charges for the FCE tests were fraudulent in that the tests were medically unnecessary and performed – to the extent that they were performed at all – pursuant to illegal kickbacks and the Defendants' fraudulent treatment protocol.

146.    Typically, Oganesov purported to perform the FCE tests, which then were billed by the Defendants to GEICO through Emmons Avenue.

147.    The Defendants billed the FCE tests to GEICO under CPT code 97800 for a charge of $614.00 per each round of FCE testing that they purported to provide.

### a.    Legitimate Uses and Requirements for FCE Testing

148.    An FCE test is a diagnostic test that assesses an individual's physical capacities and functional abilities by matching human performance levels to the demands of a specific occupation or

work activity.  FCE tests establish the physical level of work an individual can perform and can be useful in determining job placement, job accommodation, or ability to return to work following an injury or illness. FCE tests also can provide objective information regarding functional work ability for use in determination of an individual's occupational disability status.

149.   The Fee Schedule makes clear that FCE tests only should be used to determine an individual's ability to assume or return to work. As the Fee Schedule states:

> Indications
>
> The FCE is utilized for the following purposes:
>
> A)   To determine the level of safe maximal function at the time of maximal medical improvement.
>
> B)   To provide a pre-vocational baseline of functional capabilities to assist in the vocational rehabilitation process.
>
> C)   To objectively set restrictions and guidelines for return to work.
>
> D)   To determine whether specific job tasks can be safely performed by modification or technique, equipment or by further training.
>
> E)   To determine whether additional treatment or referral to a work hardening program is indicated.
>
> F)   To assess outcome at the conclusion of a work hardening program.

150.   The Fee Schedule also places certain limits on – among other things – who may perform an FCE test, and the circumstances under which FCE tests may be performed. Specifically, the Fee Schedule provides that:

> (i)    FCE tests only may be performed by: (a) a licensed physical therapist; (b) a licensed occupational therapist; or (c) another licensed healthcare provider qualified by his or her scope of practice, and constant supervision of the FCE test by the licensed provider is required.
>
> (ii)   FCE tests only may be performed only at the point of maximal medical improvement in the opinion of the attending physician.

(iii)    FCE tests may not be prescribed prior to three months post-injury unless there is a significant documented change in the status of the patient which justifies earlier utilization.

(iv)    FCE tests only may be performed where the patient: (a) is preparing to return to a previous job; (b) has been offered a new job; or (c) is working with a rehabilitation provider and a vocational objective is established.

151.    The Defendants routinely provided FCE tests prior to three months post-injury.  Even more, these tests were duplicative of the manual range of motion and muscle strength tests that were purportedly provided during every initial consultation.

152.    For example:

(i)    On April 28, 2021 an insured named WN was purportedly involved in a motor vehicle accident. On April 29, 2021 WN treated with Emmons Avenue, during which WN underwent an initial consultation.  Then on May 6, 2021, WN underwent a FCE through Emmons Avenue, just 6 days after the motor vehicle accident and 6 days after an initial consultation.

(ii)    On May 3, 2021 an insured named SM was involved in a motor vehicle accident. On May 6, 2021 SM treated with Emmons Avenue, during which SM underwent an initial consultation.  Then on May 12, 2021, SM underwent a FCE through Emmons Avenue, just 9 days after the motor vehicle accident and just 6 days after an initial consultation.

(iii)    On June 12, 2021 an insured named MA was involved in a motor vehicle accident.  On June 14, 2021 MA treated with Emmons Avenue during which MA underwent an initial consultation.  Then on June 25, 2021, MA underwent a FCE through Emmons Avenue, just 13 days after the motor vehicle and 11 days after an initial consultation.

(iv)    On June 20, 2021 an insured named JW was involved in a motor vehicle accident.  On June 23, 2021 JM treated with Emmons Avenue during which MA underwent an initial consultation.  Then on June 30, 2021 JM underwent a FCE through Emmons Avenue, just 10 days after the motor vehicle and 11 days after an initial consultation.

(v)    On June 5, 2021 an insured named GAO was involved in a motor vehicle accident.  On June 10, 2021 GAO treated with Emmons

Avenue during which GAO underwent an initial consultation.  Then on June 11, 2021 GAO underwent a FCE through Emmons Avenue, just 6 days after the motor vehicle accident and just 1 day after the initial consultation.

(vi)    On May 18, 2021 an insured named JT was involved in a motor vehicle accident.  On May 18, 2021 JT treated with Emmons Avenue during which JT underwent an initial consultation.  Then on May 24, 2021 JT underwent a FCE through Emmons Avenue, just 6 days after the motor vehicle accident and the initial consultation.

(vii)   On June 18, 2021 an insured named VM was involved in a motor vehicle accident.  On June 24, 2021 VM treated with Emmons Avenue during which VM underwent an initial consultation.  Then on June 30, 2021 VM underwent a FCE through Emmons Avenue, just 12 days after the motor vehicle accident and just 6 days after the initial consultation.

(viii)  On February 8, 2021 an insured named YM was involved in a motor vehicle accident.  On February 16, 2021 YM treated with Emmons Avenue during which YM underwent an initial consultation.  Then on February 23, 2021 YM underwent a FCE through Emmons Avenue, just 15 days after the motor vehicle accident and just 7 days after the initial consultation.

(ix)    On May 4, 2021 an insured named DM was involved in a motor vehicle accident.  On May 12, 2021 DM treated with Emmons Avenue during which DM underwent an initial consultation.  Then on May 18, 2021 DM underwent a FCE through Emmons Avenue, just 14 days after the motor vehicle accident and just 6 days after the initial consultation.

(x)     On January 24, 2021 an insured named DAP was involved in a motor vehicle accident.  On January 28, 2021 DAP treated with Emmons Avenue during which DAP underwent an initial consultation.  Then on February 9, 2021 DAP underwent a FCE through Emmons Avenue, just 16 days after the motor vehicle accident and just 12 days after the initial consultation.

b.    The Defendants' Duplicative Billing for Medically Unnecessary FCE Tests

153.    The Defendants purported to provide FCE tests to many Insureds despite their actual

knowledge that the FCE tests, to the extent that they were performed at all, were medically unnecessary

and duplicative of the manual range of motion and muscle strength tests that they purported to provide during every initial evaluation and outcome assessment testing.

154.    The only substantive difference between the FCE tests, and the manual range of motion and manual muscle strength tests purportedly provided by the Defendants during every initial consultation, is that the FCE tests generated a digital printout of an Insured's range of motion and/or muscle strength.

155.    The range of motion and muscle strength data obtained through the use of the FCE tests were not significantly different from the information obtained through the manual testing that was part and parcel of the initial consultation purportedly provided by the Defendants to virtually every Insured.

156.    In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing was meaningless. Indeed, this was evidenced by the fact that the Defendants virtually never incorporated the results of the FCE tests into the rehabilitation programs of any of the Insureds that they purported to treat.

c.    Performance of the FCE Tests Without Regard for Insureds' Vocational Status

161.    Although the Fee Schedule provides that FCE tests may only be performed where the Insured: (i) is preparing to return to a previous job; (ii) has been offered a new job; or (iii) is working with a rehabilitation provider and a vocational objective is established, the FCE tests allegedly provided through Defendants were performed – to the extent that they were performed at all – without regard for the Insureds' vocational status.

162.    Specifically, in virtually every instance where a FCE test was purportedly provided to an Insured, the Insureds either: (i) were unemployed at the time when the underlying automobile accidents occurred, and therefore had no "previous job" to return to; (ii) lost no time from work as the result of the underlying automobile accidents, and therefore had no "previous job" to return to; (iii) had not been

offered any new employment; and/or (iv) had no "vocational objective" against which their functional capacity needed to be measured.

163.    To conceal the fact that the FCE tests were performed without regard for Insureds' vocational status, and therefore were not reimbursable under the Fee Schedule, the Defendants routinely omitted any information regarding the Insureds' vocational status from the FCE test reports that they submitted, or caused to be submitted, in support of their FCE test billing.

d.    Performance of FCE Tests Without Regard for Insureds' Medical Improvement

164.    In keeping with the fact that FCE tests are intended to determine an Insured's ability to commence or return to work, the Fee Schedule provides that FCE tests only may be performed at the point of maximal medical improvement in the opinion of the attending physician.

165.    Because an Insured is unlikely to achieve maximal medical improvement immediately after their accident, the Fee Schedule provides that FCE tests should not be performed prior to three months post-injury unless there is a significant documented change in the status of the patient that justifies earlier utilization.

166.    Because an Insured only can achieve maximal medical improvement from a single accident on a single occasion, FCE tests should be performed only once with respect to any given Insured following any single accident.

167.    Even so, the Defendants routinely purported to provide at least two FCE tests to a single Insured following a single accident, with the first and – in many cases – the second such FCE tests performed less than three months following the respective Insureds' accidents.

168.    The Defendants routinely purported to provide these FCE tests without regard for any Insured's medical improvement.

169.    To conceal the fact that the FCE tests were provided – to the extent that they were provided at all – without regard for Insureds' medical improvement, and therefore were not reimbursable under the Fee Schedule, the Defendants routinely omitted any information regarding the Insureds' recovery status from the FCE test reports that they submitted, or caused to be submitted, in support of their billing.

### 4.    The Fraudulent Charges for "Extracorporeal Shockwave Therapy"

171.    The Defendants also purported to subject Insureds to medically unnecessary extracorporeal shockwave therapy ("ESWT") "treatments."

172.    The Defendants then billed for ESWT through Emmons Avenue under CPT code 0101T, which is listed in the Fee Schedule as a "temporary code" identifying emerging technology. Temporary codes may become permanent codes or deleted during updates of the code set.

173.    The Defendants' billing for ESWT through Emmons Avenue under CPT code 0101T generally resulted in charges of $700.39 for each single ESWT treatment that they purported to provide.

174.    Emmons Avenue typically charged GEICO for three to eight sessions of ESWT per Insured, resulting in charges ranging from $2,101.17 to $5,603.12 per Insured.

175.    Pursuant to the Fee Schedule, CPT code 0101T applies to "extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy".

176.    ESWT is a nonsurgical treatment that involves the delivery of high energy shock waves to musculoskeletal areas of the body with the purported goal of reducing pain and promoting the healing of affected soft tissue.

177.    During ESWT treatment, the practitioner moves an applicator over a gel-covered treatment area.  As the applicator is moved over the treatment area, high energy shock waves that purportedly stimulate the metabolism, enhance blood circulation, and accelerate the healing process are released into the treatment area.

178.     Typically, Defendants purportedly performed ESWT treatments on Insureds who were purportedly experiencing musculoskeletal pain, including back, shoulder, and/or neck pain.

179.     In a legitimate clinical setting, treatment for neck, back, or shoulder pain should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

180.     If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.  These clinical approaches are well-established.

181.     By contrast, the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational.

182.     In keeping with the fact that ESWT for the treatment of back, neck, and shoulder pain is not a legitimate treatment option, ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain.

183.     In addition, the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

184.     What is more, there is insufficient legitimate peer reviewed data that establishes the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

185.     In keeping with the fact that ESWT for the treatment of musculoskeletal conditions is not a legitimate treatment option: (i) Aetna insurance company considers ESWT experimental and investigational for the treatment of low back pain, lower limb conditions, and other musculoskeletal indications and, as such, does not cover it; (ii) UnitedHealth Group Incorporated care does not cover

ESWT for the treatment of musculoskeletal or soft tissue indications due to insufficient evidence of its efficacy in those applications; (iii) the Blue Cross Blue Shield Association does not cover ESWT for the treatment of musculoskeletal conditions because it is considered investigational; and (iv) Cigna considers ESWT experimental, investigational, or unproven for any indication, including the treatment of musculoskeletal conditions and soft tissue wounds, and therefore does not cover it.

186.    The Defendants' billing for ESWT treatments through Emmons Avenue was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to such treatments.

187.    In keeping with the fact that the ESWT was provided without regard to the needs of the patient, the Defendants routinely performed ESWT treatments to Insureds soon after their accident and without giving the patients the opportunity to sufficiently respond to conservative physical therapy.

188.    For example, Insureds were subjected to the experimental ESWT treatments by Emmons Avenue Medical less than 20 days after their accidents, including many who were subjected to such treatments within 2 weeks of their accidents.

189.    For example:

     (i)     On March 22, 2021 an Insured named DR was involved in a motor vehicle accident.  Thereafter, on March 29, 2021 DR received ESWT through Emmons Avenue, just 7 days after the motor vehicle accident.

     (ii)    On March 22, 2021 an Insured named GR was involved in a motor vehicle accident.  Thereafter, on March 29, 2021 GR received ESWT through Emmons Avenue, just 7 days after the motor vehicle accident.

     (iii)   On April 21, 2021 an insured named MR was involved in a motor vehicle accident. Thereafter on April 28, 2021 MR received ESWT through Emmons Avenue, just 7 days after the motor vehicle accident.

     (iv)   On March 15, 2021 an Insured named JB was involved in a motor vehicle accident. Thereafter on March 18, 2021 JB received ESWT

through Emmons Avenue, just 3 days after the motor vehicle accident.

(v)    On March 21, 2021 an insured named KAW was involved in a motor vehicle accident. Thereafter, on March 23, 2021 KAW received ESWT through Emmons Avenue, just 2 days after the motor vehicle accident.

(vi)    On March 16, 2021 an insured named ER was involved in a motor vehicle accident. Thereafter, on March 18, 2021 ER received ESWT through Emmons Avenue, just 2 days after the motor vehicle accident.

(vii)    On February 3, 2021 an insured named AO was involved in a motor vehicle accident. Thereafter, on February 8, 2021 AO received ESWT through Emmons Avenue, just 5 days after the motor vehicle accident.

(viii)    On April 19, 2021 an insured named AP was involved in a motor vehicle accident. Thereafter, on April 26, 2021 AP received ESWT through Emmons Avenue, just 7 days after the motor vehicle accident

(ix)    On March 29, 2021 an insured named CW was involved in a motor vehicle accident. Thereafter on April 6, 2021 CW received ESWT through Emmons Avenue, just 8 days after the motor vehicle accident.

(x)    On April 11, 2021 an insured named TM was involved in a motor vehicle accident. Thereafter on April 21, 2021 TM received ESWT through Emmons Avenue, just 10 days after the motor vehicle.

190.    These are only examples. In many of the claims identified in Exhibit "1", the Defendants routinely purported to provide Insureds with the experimental ESWT before the Insureds had an opportunity to receive conservative treatment.

191.    Contrary to the Defendants' false representations, the charges for the ESWT treatments were medically unnecessary, part of the Defendants' fraudulent treatment and billing protocol, and designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

192.     In keeping with the fact that the ESWT treatments were provided to Insureds to inflate billing submitted to GEICO rather than to treat Insureds, Emmons Avenue routinely submitted a pre-printed one-page form with the heading "Extracorporeal Shockwave Therapy".  This pre-printed form, which allows the treating provider to gauge how the insured tolerated ESWT treatment and whether there was any improvement in pre and post range of motion often indicated that there was no improvement. Even more, this report was often left blank.

193.     Contrary to the Defendants' false representations, the charges for the ESWT treatments were medically unnecessary, part of the Defendants' fraudulent treatment and billing protocol, and designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

194.     In keeping with the fact that the ESWT treatments purportedly performed by Emmons Avenue were not medically necessary and was performed pursuant to predetermined protocols to maximize profits, Emmons Avenue routinely provided the same number of treatment sessions of ESWT to multiple Insureds involved in the same accident at or about the same time.

195.     For example:

     i.    Two Insureds — ML and GP – were involved in the same automobile accident on March 14, 2021. Thereafter, both Insureds received 4 sessions of the experimental EWST through Emmons Avenue.

     ii.   Two Insureds — VD and CA – were involved in the same automobile accident on October 16, 2020. Thereafter, both Insureds received 4 sessions of the experimental EWST through Emmons Avenue.

     iii.  Two Insureds — EV and GR – were involved in the same automobile accident on January 28, 2021. Thereafter, both Insureds received 4 sessions of the experimental EWST through Emmons Avenue.

     iv.  Two Insureds — LA and HD – were involved in the same automobile accident on March 26, 2021. Thereafter, both Insureds received 5 sessions of the experimental EWST through Emmons Avenue.

> v.   Two Insureds — JA and SL – were involved in the same automobile accident on November 8, 2020. Thereafter, both of these Insureds received 5 sessions of the experimental EWST through Emmons Avenue.

196.   It is improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology that would require experimental ESWT treatments, to the extent ESWT was even medically necessary.

197.   It is also improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology that would require the virtually identical number of experimental ESWT treatments, to the extent ESWT was even medically necessary, particularly since the Defendants represented that ESWT was performed only after the Insureds "had not sufficiently responded to conservative physical therapy."

198.   Furthermore, the Defendants' charges for the medically unnecessary ESWT also were fraudulent in that the Defendants did not even actually provide high energy ESWT that satisfied the requirements of CPT code 0101T.

199.   Instead, the Defendants actually provided Radial Pressure Wave Therapy.

200.   Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave.

201.   Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T.

202.   Upon information and belief, Emmons Avenue utilized a portable, compact radial wave pressure device that does not even purport to be able to provide the high energy capacity necessary to produce a true shock wave.

203.   Accordingly, even if the ESWT was approved for, or had any documented effectiveness for, the treatment of back, neck, and shoulder pain – which it does not – Emmons Avenue did not even

provide the high energy ESWT treatments, but merely a form of pressure wave therapy that the Defendants fraudulently billed under CPT code 0101T.

204.    Moreover, even if the Defendants did provide high energy extracorporeal shockwave treatments in compliance with the code requirements, the Defendants nevertheless inflated the charges permissible for such high energy extracorporeal shockwave services.

205.    For qualifying services, CPT code 0101T allows a single charge for "extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy.  The Defendants, in order to fraudulently inflate the charges to insurers, typically billed for multiple charges per day for each Insured based on the number of body parts that were provided with extracorporeal shockwave services, rather than billing a single charge for services involving the musculoskeletal system.

206.    In short, the billing for ESWT treatments was part of the Defendants' fraudulent treatment and billing protocol, was designed solely to financially enrich the Defendants, and had absolutely nothing to do with genuine patient care.

**V.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

207.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through Emmons Avenue to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

208.    The  Defendants' billing forms (*i.e*, NF-3 and/or HCFA-1500 forms) and treatment reports submitted to GEICO by and on behalf of Emmons Avenue were false and misleading in the following material respects:

> (i)    The billing forms and supporting documentation submitted by and on behalf of Emmons Avenue uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services, to the extent provided at all, were not medically necessary and were provided pursuant to pre-determined fraudulent

protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)     The billing forms and supporting documentation submitted to GEICO by and on behalf of Emmons Avenue uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided; and

(iii)    The billing forms and supporting documentation submitted by and on behalf of Emmons Avenue uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

## VI.     Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

209.     The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

210.     To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

211.     Specifically, the Defendants knowingly misrepresented and concealed facts related to Emmons Avenue in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

212.     Additionally, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

213.     In fact, among other things, Defendants rendered, or purported to render, the Fraudulent Services at different No-Fault clinics indiscriminately and at different times in order to conceal the volume of billing for any particular service and the volume of billing from any particular Clinic.

214.    Additionally, the Defendants entered into complex financial arrangements that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

215.    Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

216.    The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

217.    GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner.  GEICO also is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $365,000.00 based upon the fraudulent charges.

218.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
**Against Emmons Avenue**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

219.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

220.     There is an actual case in controversy between GEICO and the Defendants regarding more than $678,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO under the name of Emmons Avenue.

221.     Emmons Avenue has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

222.     Emmons Avenue has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

223.     Emmons Avenue has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback payments paid for patient referrals.

224.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Emmons Avenue has no right to receive payment for any pending bills submitted to GEICO under the name of Emmons Avenue.

## AS AND FOR A SECOND CAUSE OF ACTION
**Against Oganesov and Emmons Avenue**
**(Common Law Fraud)**

225.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

226.    Oganesov and Emmons Avenue intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

227.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Emmons Avenue and Oganesov; (ii) in every claim, the representation that Emmons Avenue was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; and (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

228.    Oganesov and Emmons Avenue intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Emmons Avenue that were not compensable under the No-Fault Laws.

229.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $365,000.00 pursuant to the fraudulent bills submitted by Defendants through Emmons Avenue. The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that Defendants submitted, or caused to be submitted, to GEICO.

230.    Oganesov and Emmons Avenue's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

231.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
**Against Oganesov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

232.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

233.    Emmons Avenue is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

234.    Oganesov knowingly has conducted and/or participated, directly or indirectly, in the conduct of Emmons Avenue's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges since its inception seeking payments that Emmons Avenue was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) Emmons Avenue obtained its patients through the Defendants' illegal kickback scheme. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

235.    Emmons Avenue's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular

ways in which Oganesov operated Emmons Avenue, inasmuch as Emmons Avenue never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Emmons Avenue to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Emmons Avenue to the present day.

236.    Emmons Avenue is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Emmons Avenue in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

237.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $365,000.00 pursuant to the fraudulent bills submitted by the Defendants through Emmons Avenue.

238.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FOURTH CAUSE OF ACTION
**Against Oganesov and John Doe Defendants "1-10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

239.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

240.    Emmons Avenue is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

241.    Oganesov and John Doe Defendants "1" - "10" are employed by and/or associated with the DEO enterprise.

242.    Oganesov and John Doe Defendants "1"-"10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Emmons Avenue's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges since its inception seeking payments that Emmons Avenue was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) Emmons Avenue obtained its patients through the Defendants' illegal kickback scheme.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

243.    Oganesov and John Doe Defendants "1"- "10" knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

244.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $365,000.00 pursuant to the fraudulent bills submitted by Defendants through Emmons Avenue.

245.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
**Against Oganesov and Emmons Avenue**
**(Unjust Enrichment)**

246.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

247.     As set forth above, Oganesov and Emmons Avenue have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

248.     When GEICO paid the bills and charges submitted by or on behalf of Emmons Avenue for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

249.     Oganesov and Emmons Avenue have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

250.     Oganesov and Emmons Avenue's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

251.     By reason of the above, Oganesov and Emmons Avenue have been unjustly enriched in an amount to be determined at trial, but in no event less than $365,000.00.

## AS AND FOR A SIXTH CAUSE OF ACTION
**Against John Doe Defendants "1" - "10"**
**(Aiding and Abetting Fraud)**

252.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

253.     John Doe Defendants "1" – "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Oganesov and Emmons Avenue.

254.     The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of Emmons Avenue and the provision

of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for Emmons Avenue, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

255. The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Oganesov or Emmons Avenue to obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

256. John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Oganesov and Emmons Avenue for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

257. The conduct of John Doe Defendants "1" – "10" caused GEICO to pay more than $365,000.00 pursuant to the fraudulent bills submitted through Emmons Avenue.

258. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

259. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory damages in no event less than $365,000.00, along with punitive damages, interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

260.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Emmons Avenue, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Emmons Avenue has no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Oganesov and Emmons Avenue, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $365,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

C.    On the Third Cause of Action against Oganesov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $365,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Oganesov and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $365,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.    On the Fifth Cause of Action against Oganesov and Emmons Avenue, more than $365,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

F.    On the Sixth Cause of Action against John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$365,000.00   together with punitive damages, costs, interest, and such other and further relief as

this Court deems just and proper.

Dated:  July 5, 2022
      Uniondale, New York

                                  RIVKIN RADLER LLP


                                  By:   */s/ Michael A. Sirignano*
                                      Michael A. Sirignano, Esq.
                                      Barry I. Levy, Esq.
                                      Melissa D. Medilien, Esq.
                           926 RXR Plaza
                           Uniondale, New York 11556
                           (516) 357-3000

                           *Counsel for Plaintiffs Government*
                           *Employees Insurance Company, GEICO*
                           *Indemnity Company, GEICO General*
                           *Insurance Company and GEICO Casualty*
                           *Company*